MEMORANDUM OF DECISION
This is an action for the termination of the parental rights of Lori Ann A. and Paul A., the biological parents of Luke A. born on September 9, 1992. On the morning of the day set for the trial of the case the mother filed a consent to terminate her parental rights. The court finds that on September 14, 1998, following the testimony of a psychiatrist, Richard Sadler, that Lori was competent to assist in her defense and that she understood the nature of the proceedings. The court now finds that the consent to terminate her parental rights was knowingly and voluntarily signed with a full understanding of her legal rights and with the advice and assistance of competent counsel. Upon the acceptance by the court, the petitioner, the Department of Children and Families ("DCF"), moved to amend the petition to allege the consent of the mother. The amendment was granted without objection.
The child's father was effectively represented by counsel and opposed the termination of his parental rights. The court heard testimony of a police officer, a social worker, and the court appointed evaluator, Dr. Richard Sadler. The petitioner presented twenty-three documents as exhibits. Having heard the testimony and considered the evidence, the court makes the following findings by clear and convincing evidence.
The police officer, a ten and one-half year veteran, testified that on September 9, 1996 he investigated a complaint at a multi-family apartment house where the parents, Lori and Paul A. and the child, Luke, occupied a second floor apartment. The officer, who handled the police departments abuse and neglect cases, stated that in the stairway leading to the apartment he detected the distinct odor of urine and feces. He testified that the interior of the apartment was "a total mess:" the floors and rug were covered with urine, feces, and dried food. Smeared feces was present among the child's clothes and bedding. The officer stated that he found the premises to be unfit living conditions; he called the Health Department, the animal control officer, and CT Page 12430 the fire marshal. He stated that the parents thought the conditions to be "all right." The officer stated that he subsequently arrested the parents for risk of injury to the four year old child, Luke. The officers report, Petitioner's Exhibit #5, and photographs he took, Petitioner's Exhibit #6A-T, were entered.
The DCF social worker testified that she, personally, had been involved with this family since September 11, 1995, but that the agency had had earlier involvement with the parents. The mother had lost custody of two older children, one through a transfer of guardianship and the other through a termination of her parental rights. Both parents have long histories of mental illness, domestic violence, and non-compliance with recommended treatment. The father has a record of eight arrests and is a convicted felon. Petitioner's Exhibit #4.
Dr. Richard Sadler was called and qualified as an expert in psychiatry. He testified that he found Paul's performance as a parent inadequate. Dr. Sadler stated that Paul was unable to understand the problems in the household, the major parenting issues relating to Luke's mother, and the needs of the child. His conclusion was that Paul had no understanding as to why everyone was concerned. Dr. Sadler concluded that Paul was not able to benefit from treatment: during a number of years that Paul had been offered treatment, Paul hadn't benefitted [benefited] from any treatment; he was reluctant to participate; he advised his wife to disregard medical advice and treatment; and he refused to address very specific problems. This represented a major impairment to his parenting ability. Dr. Sadler's stated his opinion that Paul had not been capable of caring for Luke in the past, and that he was not able to competently care for Luke at this time.
Dr. Sadler noted that Dr. David Mantell evaluated the whole family in April, 1996:
 He found the father to demonstrate schizoid and over controlled features. Mr. A. was both rigid and vague in his responses. His responses were also noted to be impoverished regarding thought content. Mr. A. had not worked in the past five years. Mr A. was not able to explain why he had been unable to work . . . [T]he psychological profile obtained by Dr. Mantell described Mr A. as a narcissistic, antisocial, aggressive and passive-aggressive individual. . . . `[B]ased on profile evaluation, a severe mental disorder is CT Page 12431 indicated.'" Petitioner's Exhibit #22, p. 2.
While the child's mother has consented to a termination of her parental rights, it should be noted that she had profound mental difficulties. She was frequently hospitalized in psychiatric facilities. Not only would Mr. A. not secure treatment for his problems, he would undermine the treatment of the child's mother. Petitioner's Exhibit #1, p. 22.
Further, the court finds that Mr. A. did not comply with the expectations set forth by the court to facilitate a reunification of the family. Petitioner's Exhibit #2. He failed to participate in anger management classes, counseling, and parenting classes.
 Adjudication
The court, having reviewed the testimony and the exhibits, finds by clear and convincing evidence that on March 14, 1996, the court (Potter, J.) adjudicated the child, Luke, neglected and the father has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time considering the age and needs of the child, such parent could assume a responsible position in the life of the child. General Statutes 17a-112(c)(3)(B).
 Disposition
The principal issue presented as a defense in court was not whether Paul (Mr. A.) could care for Luke, but rather whether the plan for Luke should be long term foster care, with some visitation for the father, or whether the court should terminate the parental rights of this very adoptable six year old in order to allow him permanency through adoption in a stable, nurturing, and secure home. The attorney for the father and the child's attorney favor the former plan, long term foster care. The petitioner seeks the latter plan, termination and subsequent adoption.
It is not disputed that the child knows who his father is and enjoys the very limited contact he has with him. This fact alone would seem to dictate against termination of parental rights, especially in light of the holding in In re Migdalia:
 If, however, the parents of a child with developmental disabilities have parenting limitations but love their CT Page 12432 child, consistently express an interest in the child's welfare and periodically visit with the child committed to foster care, parental rights should not be terminated, since the situation affords the child both the consistency of foster parenting and the relationship with natural parents. 6 Conn. App. 194, 207-08, 504 A.2d 532 (1986).
This court finds that, while long term foster care may have been an acceptable permanency plan in 1986, the focus of the sociological and legal principles has changed regarding notions of long term foster care since they were articulated by the Connecticut Appellate Court at that time. Two recent federal pronouncements confirm the change in focus.
 Adoption 2002: The President's Initiative on Adoption and Foster Care
On December 14, 1996 President Clinton, in Executive Memorandum, said
 I am committed to giving the children waiting in our Nation's foster care system what every child in America deserves — loving parents and a healthy, stable home. The goal for every child in our Nation's public welfare system is permanence in a safe and stable home, whether it be returning home, adoption, legal guardianship or another permanent placement. While the great majority of children in foster care will return home, for about one in five, returning home is not an option, and they will need another home, one that is caring and safe. These children wait far too long — typically over three years, but for many children much longer — to be placed in permanent homes. Each year State child welfare agencies secure homes for less than one-third of the children whose goal is adoption or an alternate permanent plan. I know we can do better.
President Clinton directed Secretary of Health and Human Services Donna Shalala to make specific recommendations to move children from foster care to permanent homes and to meet the goal of doubling the number of adoptions in America by the year 2002. On February 14, 1997 Secretary Shalala issued Adoption 2002: AResponse to the Executive Memorandum on Adoption. The very first statement of that document is that "[e]very child deserves a safe and permanent family." CT Page 12433
The Guidelines for implementation of the Shalala response indicate that:
A permanent placement includes the following characteristics:
 1. It is legally intended to be permanent, both to last throughout the child's minority and to establish family relationships that will last for the child's lifetime.
2. It is legally secure from modification.
 3. It is binding on the adult or adults who are awarded permanent care and control of the child.
 4. The permanent care giver has the equivalent legal responsibility for the child as a birth parent.
5. The government no longer acts as parent of the child.
 Adoption 2002: The President's Initiative on Adoption and Foster Care (1998).
Foster care and legal guardianship do not meet all of these requirements. The only form of permanency planning that meets all these requirements is adoption. Under foster care, the child is not permanently in the home to last throughout the child's lifetime. Foster care placement is not secure from modification. Foster care is not permanent with respect to the adult foster parent. And, the government is still involved as the custodian.
Under the Department of Health and Human Services response to the President's initiative, adoption, "the legal and permanent transfer of parental rights and responsibilities to adoptive parents, is the preferred permanent placement for a child who cannot safely return home."
The Adoption and Safe Families Act of 1997 (Public Law 105-89)
The second recent federal development relates to the passage of the Adoption and Safe Families Act of 1997 (Public Law 105-89). Since the early 1980's Connecticut's law has been crafted to comply with the Adoption Assistance and Child Welfare Act of 1980 (Public Law 96-272). Indeed, judges are required to consider that act in all termination of parental rights cases by General CT Page 12434 Statutes § 17a-112(e)(2). But the 1980 federal legislation did not meet its objectives of reducing the time children spent in foster, i.e. to prevent "foster care drift."
Congress intended that Public Law 96-272 would mitigate the need for the placement of children into foster care and encourage greater efforts by State agencies to find permanent homes for children — either by making it possible for them to return to their own families or by placing them in adoptive homes. The goals of Public Law 96-272 have not yet been fully realized, however, as evidenced by continued increases in the numbers of children entering foster care, increasing lengths of stay in care, and growing concerns about the safety, permanency, and well-being of children served by public agencies. Department of Health and Human Services, Administration for Children and Families, [Proposed Rules] Federal Register: Vol. 63 No. 181, p. 6., Sept. 18, 1998.
The new federal legislation, the Adoption and Safe Families Act of 1997 (emphasis added), is designed to reduce the time children spend in foster care by requiring the child protection agencies to completely revise their reviewing process, by setting shorter and stricter time frames for review and action, and by increasing the judicial oversight of the process from the day of removal of a child from the home all the way to the return of the child to the home or to permanency through adoption. See generally, Notice of Proposed Rulemaking, id. at 7.
On November 19, 1997 President Clinton signed the first child welfare reform legislation since Public Law 96-272 in 1980. The Adoption and Safe Families Act (ASFA) seeks to provide States the necessary tools and incentives to achieve the original goals of Public Law 96-272: safety; permanency; and child and family well-being. The impetus for ASFA was a general dissatisfaction with the performance of the child welfare system in achieving these goals for children and families. This dissatisfaction came as a result of:
 (1) A number of high profile child deaths across the country, the occurrence of which was often attributable to confusion and misinterpretation over the reasonable efforts provision. This confusion stems from the notion that there is a lack of clarity about the relationship between reasonable efforts and child safety;
 (2) Growth in the foster care caseload. We are now slightly in excess CT Page 12435 of a half-million children in foster care on any one day. This number has almost doubled since the mid-eighties. More children are coming into foster care each year than are exiting;
(3) Increased costs of foster care; and,
 (4) A need for greater emphasis on individual responsibility by parents and accountability by States for moving children to permanency in a timely manner. See generally, Notice of Proposed Rulemaking, id. at 7.
Based upon the clarity of statement as expressed in the President's initiative and the federal legislation, this court concludes that except in an extremely small number of cases where good cause is shown, courts should try to effectuate the declared goals of either returning the child home or placing the child in adoption. In the present case, the male biological parent of the child has not been able to adequately parent the child. The evaluators indicate that Paul A. has severe mental limitations. He is wholly unable to meet the general obligations of parenthood:
 [T]he commonly understood general obligations of parenthood entail these minimum attributes: (1) express love and affection for the child; (2) express personal concern over the health, education and general well-being of the child; (3) the duty to supply the necessary food, clothing and medical care; (4) the duty to provide an adequate domicile; and (5) the duty to furnish social and religious guidance." In re Juvenile Appeal (Docket 9489), 183 Conn. 11, 15 (1981).
The court must weigh the value of the limited, but enjoyable, relationship that Luke has with his male biological parent, who is unable to ever effectively parent him, and with Luke's remaining in foster care, against the possibility of a secure, safe and permanent family which may be available to him through adoption. Based upon the demonstrated inability of Mr. A. to parent the child, the mentally disordered life of the male biological parent, the unacceptable values which Luke learned from his biological parents,[2] and the need for this child to have some finality in his life, the court finds that between adoption and long term foster care, adoption presents the best chance for a successful outcome.
 Mandatory Findings:
CT Page 12436
The court makes the following factual findings required by17a-112(e):
(1) Appropriate and timely services were provided by the Department of Children and Families including in-home supervision and parent aide, counseling, transportation assistance, and visitation coordination.
(2) The court finds by clear and convincing evidence that the Department of Children and Families made reasonable efforts to reunify the parents and child. The agency made reunification efforts and provided services for nearly two years. The action of DCF to institute termination proceedings is consistent with the federal law designed to eliminate foster care drift and to provide for permanency in the child's family setting. Further, the court finds in this proceeding that the father is unable or unwilling to benefit from reunification efforts. § 17a-112(c)(1).
(3) The Department, with the approval of the Court, set reasonable and realistic expectations in order to reunify the family. There was only minimal compliance by the father.
(4) The child had strong emotional ties to the foster parents who had considered adoption of Luke until an unfortunate episode occurred. The agency believes that Luke is extremely adoptable and a legal risk or pre-adoptive home will be immediately pursued. The father's modest relationship with Luke has been previously discussed, infra.
(5) Finding regarding the age of the child. Luke is six years of age. The child requires stability of placement and continuity of care. Our Supreme Court has long recognized the deleterious effect of prolonged temporary care of abused and neglected children. In re Juvenile Appeal (84-CD), 189 Conn. 276 (1983). The Appellate Court has also noted, "[b]ecause of the psychological effects of prolonged termination proceedings on young children, time is of the essence." In re Alexander V.,25 Conn. App. 741, 748, 596 A.2d 930 (1992).
(6) Finding regarding efforts of the parents to adjust their circumstances, conduct or conditions etc. The father has not made realistic and sustained efforts to conform his conduct to even minimally acceptable parental standards. Giving him additional time would not likely bring his performance, as a parent, within CT Page 12437 acceptable standards sufficient to make it in the best interests of the child to be reunited. In re Luis C., 210 Conn. 157 (1989); In re Juvenile Appeal, 183 Conn. 11, 15 (1981). (A) Degree to which parent has maintained contact with the child. The father has maintained contact with the child during visitation. The court recommends that the Commissioner consider continuing visits until an adoptive home is found in order to give the father and son an opportunity to bring closure to their limited relationship. (B) Maintained regular contact or communications with the guardian. Not applicable.
(7) Finding regarding the prevention of a parent from having a meaningful relationship, etc. As far as known, the child and parent lived in reasonable geographic proximity and that transportation for visitation was offered and provided. The Department attempted to maintain contact. No unreasonable conduct is noted.
The court finds that the ground for termination of parental rights has existed over an extended period of time which is greater than one year.
 ORDER
Based upon the foregoing findings, the court concludes that it is in the best interests of the child, Luke, to terminate the parental rights of his mother by her consent, and to involuntarily terminate the parental rights of his father. It is accordingly ORDERED that the parental rights of Lori A. and Paul A. are hereby terminated. The Commissioner of the Department of Children and Families is hereby appointed the statutory parent. A permanency plan shall be submitted within ninety days. A review Plan for Terminated Child shall be filed in accordance with Federal Law.
Judgment may enter accordingly.
Foley, J.